IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
------------------------------------------------------x
                                        :
M.A. ET AL.                             :         3:10 CV 1890 (JGM)
                                        :
v.                                      :
                                        :
TORRINGTON BOARD OF EDUCATION           :
                                        :         DATE: SEPTEMBER 10, 2013
------------------------------------------------------x
```

RULING ON CROSS MOTIONS FOR SUMMARY JUDGMENT

On December 1, 2010, plaintiff J.A., the parent of minor M.A. ["Parent" and "M.A.,"
respectively, and collectively "plaintiffs"],[1] commenced this action against defendants City of
Torrington and the Torrington Board of Education ["defendant Board" and collectively
"defendants"], pursuant to Article First, §§ 8 and 20, as amended, and Article Eighth, § 1, as
amended, of the Connecticut Constitution; Connecticut General Statutes §§ 10-220, 10-231e,
10-291, 10-207, 10-4a, 10-15, 10-157, 10-184, 10-76a, 10-76d, and 10-76h et seq., and
Connecticut Agencies Regulations § 10-76a-2; the Individuals with Disabilities Education Act
["IDEA"], 20 U.S.C. § 1415 and the Individuals with Disabilities Improvement Act of 2004, 20
U.S.C. § 1400 et seq.; and the due process clauses and equal protection clauses of the Fifth
and Fourteenth Amendments to the United States Constitution.  (Dkt. #1).[2]  This action is an
administrative appeal of a due process hearing officer's decision, dated November 15, 2010,
in Student v. Torrington Board of Education, Case No. 09-0552, which dismissed with

---

[1]M.A. is now twenty-one but was a minor during all of the relevant years at issue.  (See Complaint, ¶ 2).  He is the youngest of four children.  (Admin. Rec., 09-0552, 10/8/09 Hearing Tr. at 52); see note 14 infra.

[2]A redacted version of the Complaint was filed, with the original Complaint and attachment, under seal.  (Dkts. ##1, 3; see Dkts. ##2, 17).  The Court will refer to the redacted Complaint in this Ruling.

Attached as Attachment A to the redacted Complaint is a copy of the hearing officer's Amended Final Decision and Order, dated November 15, 2010.

prejudice plaintiffs' request for the hearing officer to declare, inter alia, that defendants improperly failed to identify M.A. as a child requiring special education and related services under Other Health Impairment ["OHI"] for the school years of 2006-2007, 2007-2008, 2008-2009, and 2009-2010.  (Complaint, ¶ 8; see Complaint, Attachment A ["HO Decision"]).[3]

On March 8, 2011, United States District Judge Janet Bond Arterton referred this case to this Magistrate Judge. (Dkt. #24).  Eight days later, defendants filed a partial Motion to Dismiss.  (Dkt. #26).[4]  Less than one month later, on April 20, 2011, this Magistrate Judge issued a Recommended Ruling ["April 2011 Ruling"], in which defendants' Motion to Dismiss was granted, thereby dismissing defendant City of Torrington, and dismissing Counts Five and Six[5] (Dkt. #35); plaintiffs objected to the Recommended Ruling (Dkt. #36; see also Dkt.

---

[3]The Complaint rested upon six counts: denial of an opportunity for the parents to have individualized education program ["IEP"] meetings and a determination as to the eligibility of M.A. for special education (Count One); denial of an evaluation of the child as eligible for special education (Count Two); denial of an opportunity for the parents to have a due process hearing (Count Three); hearing officer's error in finding that M.A. was not eligible for special education under OHI (Count Four); hearing officer's error in allowing defendants to conduct an IEP meeting and evaluation of the child in 2010 during the due process hearing and basing her decision regarding all claims on that IEP and evaluation (Count Five); and defendants' and the hearing officer's violation of M.A.'s rights pursuant to the Connecticut Constitution (Count Six).

[4]Plaintiffs also filed a Motion for Default Entry 55(a) as to both defendants on that same day  (Dkt. #28), in which plaintiffs contend that defendants' Motion to Dismiss was not an "effective" motion "that would have altered the time period for filing any Answer to the [C]omplaint on or before the March 17, 2011 deadline; and in the alternative, because defendant Torrington Board of Education, failed to file any Answer to Counts One through Four" of the Complaint, plaintiffs request that the Court "immediately enter [a] judgment of default against the defendants, and in the alternative[,] against . . . defendant Torrington Board of Education . . . ." ( Id. at 1).

On March 22, 2011, the Clerk of Court entered an order denying plaintiffs' Motion for Entry of Default, "in light of the motion to dismiss filed on [March 16, 2011.]" (Dkt. #30).

Two days later, plaintiffs filed a Motion for Reconsideration of this Order (Dkt. #32), which was granted in the April 2011 Ruling for consideration of the arguments but, after consideration, the order of denial was left undisturbed.  Judge Arterton overruled plaintiffs' objection on this ground as the docket sheet "clearly reflects that [d]efendants properly filed a motion to dismiss within the Court's scheduling deadlines[.]" (Dkt. #49, at 3, n.1).

[5]See note 3 supra.

#37).  On September 10, 2012, Judge Arterton issued her Ruling on Plaintiff[s'] Objection to Recommended Ruling (Dkt. #49), 2012 WL 3985166 (D. Conn. Sept. 10, 2012), in which she adopted this Recommended Ruling granting defendants' Motion to Dismiss, with the modification that the Court declined to exercise supplemental jurisdiction over plaintiffs' state constitutional claims, thereby leaving the case to proceed only as an administrative appeal challenging the determinations of the hearing officer and the defendant Board under the IDEA.  2012 WL 3985166, at *2-4.

On November 14, 2012, the parties consented to the jurisdiction of this Magistrate Judge and the case was transferred accordingly.  (Dkt. #52).  On December 10, 2012, plaintiffs filed their Motion for Summary Judgment, with Local Rule 56(a)1 Statement ["Plaintiffs' Statement"] and brief in support (Dkts. ##55-57), and defendant Board filed its Motion for Judgment on the Administrative Record, with brief in support.  (Dkt. #58).   On December 31, 2012, plaintiffs filed their brief in opposition, and defendant filed its brief in opposition and its Local Rule 56(a)2 Statement ["Defendant's Statement"].  (Dkts. ##62-63). On January 10, 2013, plaintiffs filed a reply brief.  (Dkt. #64).

On December 11, 2012, defendant filed its Answer, officially filing the Administrative Record.  (Dkt. #59).[6]

---

[6]On November 26, 2002, this Magistrate Judge filed an electronic order, that observed that the administrative record had been "informally delivered" to Judge Arterton's Chambers, and then transferred to this Magistrate Judge's Chambers, and that no answer had been filed; defendant was ordered to file its answer by December 10, 2012.  (Dkt. #54).

The Administrative Record was never properly collated, Bates stamped, and organized into loose leaf binders, as in all other IDEA cases.  As a result, reference to the Administrative Record is more cumbersome than it needed to be.  Unless otherwise indicated, all references are to the Administrative Record in No. 09-0552.

Three days after defendant filed its Answer, plaintiffs filed a Motion for Default Judgment (Dkt. #60), which motion was denied in that defendant's delay in filing the Answer did not rise to the level for which default is appropriate.  (Dkt. #61).

For the reasons stated below, plaintiffs' Motion for Summary Judgment (Dkt. #55) is <u>granted in part and denied in part</u>, and defendant's Cross-Motion for Judgment on the Pleadings (Dkt. #58) is <u>granted in part and denied in part.</u>

I. BACKGROUND

<u>A. M.A.'S ATTENDANCE AT TORRINGTON PUBLIC SCHOOLS 1997-2003</u>[7]

Plaintiff M.A. attended the Torringford Elementary School in Torrington, Connecticut from August 1997 to June 2003 (Dkt. #59, Administrative Record 09-0552 ["Admin. Rec."], Hearing Officer's Decision ["HO Decision"], at 3, Findings of Fact ["FOF"] ¶ 1)(citations omitted),[8] and when plaintiff M.A. entered the school, his mother reported him to be allergic only to animals. (<u>Id.</u>)(citations omitted). (<u>See also</u> Plaintiffs' Statement ¶¶ 3, 5; Defendant's Statement ¶¶ 3, 5). According to Parent, plaintiff M.A.'s respiratory issues result from the "severe water damage and indoor mold problems" at Torringford Elementary School. (<u>See</u> Complaint ¶ 11 (citation omitted); Plaintiffs' Statement ¶ 6; Exhs. P-5, P-87, P-120 at 2, B-13). Defendant disputes that there were any such problems and points out that the "only significant absence [M.A.] had [while at Torringford Elementary School] was [thirteen] days, when he had pneumonia." (Defendant's Statement ¶ 6; 6/29/10 Hearing Tr. at 106-07; Exhs. B-1, B-2, B-5).[9]

During first grade, in 1998-1999, M.A. met all academic objectives, exceeded social

---

[7]This lawsuit concerns the school years of 2006 through 2010; the prior years have been included for background purposes only.

[8]<u>See</u> note 6 <u>supra</u>.

[9]During his testimony at the administrative hearing held on June 17, 2010, Dr. John Santilli testified that he did not do any air quality testing at the Torringford Elementary School. (6/17/10 Hearing Tr. at 55-56). He based his conclusion that there was "toxic mold exposure at school" on "the fact that there was water damage in the building" and his "evidence" of that mold damage was M.A.'s older brother P.A. (<u>Id.</u> at 68).

4

development and work habit objectives, made satisfactory progress in all school subjects, and was absent fifteen days.  (FOF ¶ 2)(citation omitted).

By October 1999, when M.A. was in second grade, Dr. Edward Kavle[10] diagnosed M.A. with reactive airway disease, allergic rhinitis, sinusitis, and asthma; in October 1999, M.A. had pneumonia; and in December 1999, Dr. Jeffrey Miller, plaintiff M.A.'s allergist from 1999 through March 2003, diagnosed M.A. with allergic rhinoconjunctivitis, asthma, and with extreme reaction to multiple inhalants, including trees, grass pollens, dust mites, and quite severe reaction to mold.  (FOF ¶ 3 (citations omitted); 10/8/09 Hearing Tr. at 54-55, 56-58; 10/27/09 Tr. at 19).  At that time, M.A. was allergic to tree pollen, grass pollen, cat and dog dander, dust mite, pollen, penicillin, ragweed, and mold, and was ultra-sensitive to picking up allergens and prone to recurrent infection. (FOF ¶26)(citations omitted).  (See also Plaintiffs' Statement ¶¶ 7-9; Defendant's Statement ¶¶ 7-9).

During his second grade school year, in 1999-2000, M.A. met all academic objectives, exceeded social development, work habit, and art class objectives, and made satisfactory progress in music and physical education, and he was absent twelve days.  (FOF ¶ 3) (citations omitted).

During third grade in the 2000-2001 school year, M.A. earned straight A's in all academic classes,  exceeded social development and work habit objectives, and was absent ten days.  (FOF ¶ 5)(citations omitted).  On or about June 2, 2001, the Torringford Elementary School Nurse sent a letter to the Parent acknowledging M.A.'s recent asthma diagnosis and inquiring as to whether M.A. could participate in the school's Fun Run on June

---

[10]Dr. Edward Kavle was the personal physician for M.A. from September 1999 through March 2003, and at that same time and to the present day, Dr. Kavle acted as the Medical Advisor for the Torrington Board of Education, pursuant to CONN. GEN. STAT. § 10-207. (10/8/09 Hearing Tr. at 54, 164; Exhs. P-122, B-19).

8, 2001, in response to which the Parent stated that M.A. "can definitely run at the Fox Run without a problem – no meds required.  In fact he is the best runner + fastest on his baseball team.  He is not restricted in any way  . . . ."  (FOF ¶ 4 (citation omitted); see 10/27/09 Hearing Tr. at 18-19).  Dr. John Santilli, M.A.'s additional allergist starting in July-August 2003 (see FOF  ¶ 11 (citations omitted); see also 10/8/09 Hearing Tr. at 55; 6/2/10 Hearing Tr. at 104), testified that M.A.'s asthma was under control at that time because it was "late spring[]" and M.A. is "mainly [allergic in] fall, late – late fall, early fall, summer, winter." (6/17/10 Hearing Tr. at 40).

During fourth grade in the 2001-2002 school year, M.A. scored at goal in reading, writing and math on the Connecticut Mastery Test; he received mostly A's in his academic classes, exceeded objectives in his non-academic classes, and was absent five days.  (FOF ¶ 6)(citations omitted).

When M.A. was in fifth grade, in the 2002-2003 school year, he earned all A's in his academic classes and was absent twelve days.  (FOF ¶ 7)(citations omitted). In March 2003, Dr. Christopher Randolph, M.A.'s pediatric allergist/immunologist starting in March 2003, diagnosed M.A. with perennial/seasonal allergic rhinitis and asthma. (Exh. P-6; 10/8/09 Hearing Tr. at 55).  (See also Plaintiffs' Statement ¶ 10; Defendant's Statement ¶ 10).

In March 2003, prior to entering sixth grade, the Parent requested that defendant identify M.A. as requiring special education related services as OHI and to provide him with a fair and appropriate public education ["FAPE"] for the 2003-2004 school year by placing him in either another public school within the district, or in an out of district private school. (FOF ¶ 9 (citation omitted); Exh. B-13; 10/8/09 Hearing Tr. at 66-67; 10/27/09 Hearing Tr. at 19-21).  In June 2003, Dr. Randolph informed defendant Board of Education that remediation of M.A.'s school environment was required in order for him to function on his current

medication, and based on reports from the Microbial Contamination Survey of January 19, 2003, there was evidence of water damage that would make the environment hostile to a child with asthma and allergic rhinitis.  (Exh. P-7).  (See also Plaintiffs' Statement ¶ 11; Defendant's Statement ¶ 11).  Dr. Randolph repeated his opinion in July 2003 and during the next month, in August 2003, Dr. Santilli informed the Board of Education that indoor air quality testing "clearly show fungi" in the Torrington Middle School, such that M.A. required an "out of district placement to avoid any disruption in the education process."  (FOF ¶ 11)(citations omitted).  (See also Plaintiffs' Statement ¶¶ 12-14; Defendant's Statement ¶¶ 12-14).[11]  Dr. Santilli recommended initiation of allergy desentization against a variety of environmental allergens, and M.A. started allergy shots in 2004.  (FOF ¶ 11)(citations omitted).

Following the removal of carpeting at the Torrington Middle School, Hygenix, Inc. conducted a test of the air quality and determined that the mold spore count was low throughout sampling locations in the school and significantly lower than the outdoor sample.  (FOF ¶ 12)(citation omitted).   On September 15, 2003, M.A. was offered alternative placement at the Southwest School within the Torrington School District, while the Board conducted further evaluations of the air quality at Torrington Middle School.   (FOF ¶ 13)(citations omitted). Parent declined the alternative placement on behalf of M.A. and unilaterally placed M.A. at St. Margaret-McTernan School, later renamed Chase Collegiate School ["Chase Collegiate"], a private school in Waterbury, Connecticut that does not have

_____

[11]Dr. Santilli also testified that while M.A. is allergic to several allergens including animals, indoor and outdoor molds, dust mites, trees and pollen, he never asked where M.A. spent his time when he was not at school because "of the fact that the history suggested that it was during the school year where the major problems were." (Id. at 58-59).  His "recollection" was that he told the Parent, "based on [P.A.] and based on what I knew and based on other patients and teachers, she's absolutely crazy if she sends him to the middle school." (Id. at 59).

a State of Connecticut Department of Education approved special education program.  (FOF ¶¶ 13-14)(citations omitted).  Dr. Santilli testified that he was not aware that the Board offered M.A. the opportunity to attend Southwest School. (6/17/10 Hearing Tr. at 62-63, 65).  He opined that he "felt at that time . . . that [M.A.] needed an out-of-district . . . placement[,]" and he did not want M.A. to go to Torrington Middle School "based on his brother's experience."  (Id. at 63-64).  (See also Plaintiffs' Statement ¶ 33; Defendant's Statement ¶ 33).

In 2003, the Board conducted a psychological evaluation, achievement testing and speech and language evaluation of M.A. to determine his eligibility for special education and/or Section 504 accommodations, which evaluation and testing revealed that M.A. was functioning within the superior range of intelligence and his academic skills were within the high average range.  (FOF ¶ 16)(citation omitted).  Progress reports from St. Margaret-McTernan School indicated that M.A. was doing well in his classes and the teachers had no concerns about his progress.  (Id.)(citations omitted).  On December 9, 2003, the Board convened a Section 504 team meeting during which, after reviewing Dr. Santilli's report and the evaluations, the Section 504 team determined that M.A. did not have a disability that substantially limited one or more of his major life activities under Section 504.  (FOF ¶17)(citation omitted).  M.A. was again offered placement at the Southwest School. (Id.)(citation omitted).

On December 9, 2003, the Board also convened a Planning and Placement Team ["PPT"] meeting during which the PPT team determined that it lacked sufficient information concerning M.A.'s current functioning in school, particularly because the Parent, who prohibited the Board from contacting St. Margaret-McTernan School directly, produced M.A.'s first trimester report card in which he earned the following grades: 89 in language arts; 96

8

in Latin; 86 in Social Studies; 92 in Math; and 91 in Science. (FOF ¶ 18)(citations omitted). On February 3, 2004, Barbara Ruggiero, Director of Student Support Services at St. Margaret-McTernan School, conducted an observation of M.A. in the classroom and submitted a report to the Board. (FOF ¶19)(citation omitted).  Seventeen days later, a PPT meeting convened to review Ruggiero's observation report; the PPT Team determined that M.A. was not eligible for special education, but agreed to conduct an independent neuropsychological evaluation at the Parent's request.  (FOF ¶ 20)(citations omitted).  Thereafter, Dr. Gregory Javornisky, a pediatric neuropsychologist, conducted M.A.'s neuropsychological evaluation and reported no concerns for his academic processing skills and abilities, and noted that M.A. should be able to function in the regular classroom environment without difficulty. (FOF ¶ 21 (citation omitted); Exh. B-51).

   B. SEVENTH & EIGHTH GRADES – 2004-2005 & 2005-2006[12]

   During the 2004-2005 school year, the Parent unilaterally placed M.A. at Chase Collegiate for seventh grade. (FOF ¶ 22)(citations omitted).  On September 17, 2004, the Board convened a Section 504 meeting and a PPT meeting.  (Id.)(citations omitted). During the Section 504 meeting, the Section 504 team requested an independent medical evaluation and the Parent presented a supplemental medical questionnaire from Dr. Randolph, dated July 8, 2003, indicating that M.A. could attend school once any water damage had been corrected.  (FOF ¶ 23)(citations omitted).  (See also Plaintiffs' Statement ¶ 15; Defendant's Statement ¶ 15). The PPT team reviewed the independent neuropsychological evaluation and concluded that M.A. was not eligible for special education services.  (FOF ¶ 24)(citation omitted).   The Section 504 team determined that M.A. was ineligible for Section 504

_____

   [12]See note 7 supra.

accommodations because Dr. Randolph's report was more than a year old, and it required more up-to-date information. (FOF ¶ 23)(citations omitted).

On September 20, 2004, Dr. Randolph examined M.A. and determined that he had mild intermittent asthma, perennial and seasonal allergic rhinitis, and was receiving immunotherapy from Dr. Santilli; M.A. was asymptomatic at the time of Dr. Randolph's examination. (FOF ¶ 25)(citation omitted).  Dr. Santilli testified at the hearing that M.A.'s performance is impacted when his allergies are bad and his ability to focus is impacted by his allergy medicine such that he sometimes needed to be brought to task and lacked motivation. (FOF ¶ 27)(citation omitted). Dr. Randolph informed the Board that M.A.  should be restricted to a clean school environment.  (Exh. B-62).

On October 7, 2004, the Section 504 team convened a meeting to review Dr. Randolph's updated report and the September 4, 2003 Torrington Middle School environmental report, and determined it needed more information. (FOF ¶ 28)(citation omitted). The Section 504 team reconvened on December 15, 2004, and after Dr. Randolph had no additional information to add to his September 20, 2004 report, the Section 504 team determined that M.A. was ineligible for Section 504 accommodations because he did not have an impairment that substantially limited one or more major life functions. (FOF ¶ 29)(citations omitted).  (See also Plaintiffs' Statement ¶ 34; Defendant's Statement ¶ 34).

During the 2005-2006 school year, the Parent unilaterally placed M.A. at Chase Collegiate for eighth grade.  (FOF ¶ 30)(citations omitted).  On August 15, 2005, the Parent requested a Section 504 meeting, which meeting was convened on October 3, 2005. (Id.)(citations omitted). During this Section 504 meeting, Dr. Santilli's medical questionnaire was reviewed, and the team determined that the Student did not have a disability that substantially limited one or more major life functions. (FOF ¶ 31)(citations omitted). The

Section 504 team's October 3, 2005 determination was appealed by the Parent and upheld by a hearing officer, finding that M.A.'s allergies did not substantially limit M.A.'s major life activities and he was therefore not considered disabled to qualify for Section 504 accommodations. (FOF ¶ 32)(citation omitted).  (See also Plaintiffs' Statement ¶ 42; Defendant's Statement ¶ 42).

### C. NINTH GRADE – 2006-2007

During the ninth grade, 2006-2007 school year, M.A. received immunotherapy and his allergies were controlled with the use of an Albuterol inhaler, as needed, and Benadryl taken for seasonal allergies. (FOF ¶ 33)(citations omitted).  M.A. had no restrictions on physical activities. (Id.)(citation omitted).  By letter dated March 26, 2007, the Parent requested a Section 504 and PPT meeting requesting eligibility under the IDEA under the OHI category and accommodations under Section 504 for M.A.'s 2006-2007 school year. (FOF ¶ 34)(citation omitted).  The Parent indicated that M.A. was unilaterally placed at  Chase Collegiate during the 2006-2007 school year. (Id.)(citations omitted).

By letter dated April 5, 2007, Judith Babcock, Director of Student Services for Torrington, directed the Parent to request a PPT meeting from the Waterbury Public Schools as she interpreted the IDEA to require the town in which the private school is located to be responsible for the student's individualized education program ["IEP"].  (FOF ¶ 35)(citations omitted). Thereafter, on May 25, 2007, the Waterbury Public Schools convened PPT meetings on May 25, 2007 and September 17, 2007, at the request of the Parent, and found that M.A. was functioning and progressing without special education and declined to place M.A. at Chase Collegiate.  (FOF ¶ 36)(citations omitted).  (See also Plaintiffs' Statement ¶¶ 43-44; Defendant's Statement ¶¶ 43-44).

### D. TENTH GRADE – 2007-2008

While in tenth grade during the 2007-2008 school year, M.A. had perennial allergies that were controlled with immunotherapy, and continued to take Benadryl and Albuterol as needed. (FOF ¶ 37)(citations omitted). He participated in indoor and outdoor interscholastic sports in home and away games without difficulties or restrictions. (Id.)(citation omitted).

By letter dated March 31, 2008, the Parent requested a Section 504 and PPT meeting to request eligibility under the IDEA under OHI, and accommodations under Section 504 for M.A.'s 2007-2008 school year. (FOF ¶ 38)(citations omitted). The Parent indicated that M.A. was unilaterally placed at Chase Collegiate during the 2007-2008 school year. (Id.)(citations omitted). On April 2, 2008, plaintiffs filed a request for a hearing, which was assigned case #07-467. (HO Decision, at 2 & n.1). By letter dated April 3, 2008, Babcock again interpreted the IDEA to require the town in which the private school is located to be responsible for M.A's IEP, and therefore directed the Parent to request a PPT meeting from the Waterbury Public Schools. (FOF ¶ 39)(citations omitted). (See also Plaintiffs' Statement ¶¶ 45-46; Defendant's Statement ¶¶ 45-46).

### E. ELEVENTH GRADE – 2008-2009

While in the eleventh grade during the 2008-2009 school year, M.A. continued to use Albuterol as needed, and participated in indoor and outdoor interscholastic sports in home and away games without difficulties or restrictions. (FOF ¶ 40)(citations omitted). By letter dated September 22, 2008, the Parent requested a Section 504 and PPT meeting for eligibility under the IDEA under the OHI category, and accommodations under Section 504 for the Student for M.A. for the 2008-2009 school year. (FOF ¶ 41)(citations omitted). The Parent indicated that the Student was unilaterally placed at Chase Collegiate during the 2008-2009 school year. (Id.)(citation omitted).

By letter dated September 24, 2008, Babcock once again interpreted the IDEA to require the town in which the private school is located to be responsible for a student's IEP, and therefore, directed the Parent to request a PPT meeting from the Waterbury Public Schools. (FOF ¶ 42)(citation omitted).  (See also Plaintiffs' Statement ¶¶ 47-48; Defendant's Statement ¶¶ 47-48).

### F. TWELFTH GRADE – 2009-2010

While in twelfth grade during the 2009-2010 school year, M.A.'s allergies improved significantly, he was no longer receiving immunotherapy and had no restrictions on activities, was no longer using Albuterol, and took Benadryl for allergies on an as needed basis.  (FOF ¶ 43)(citations omitted).  M.A. participated in indoor and outdoor interscholastic sports in home and away games without difficulties or restrictions. (Id. (citations omitted); see also 7/14/10 Tr. at 118-20 (Parent testified that M.A. played basketball and lacrosse and was only limited by a sprained ankle in basketball, and a lack of skill in lacrosse; he had no asthma attacks)).[13]  By letter dated July 8, 2009, the Parent requested a Section 504 and PPT meeting for eligibility under the IDEA under the OHI category, and accommodations under Section 504 for M.A. for the 2009-2010 school year.  (FOF ¶ 44)(citation omitted).  The Parent indicated that M.A. was unilaterally placed at Chase Collegiate during the 2009-2010 school year. (Id.) (citation omitted).  The next day, July 9, 2009, Babcock sent a letter, again interpreting the IDEA to require the town in which the private school is located to be responsible for the M.A.'s IEP, and therefore directed the Parent to request a PPT meeting from the Waterbury Public Schools.  (FOF ¶ 45)(citations omitted).  (See also Plaintiffs'

---

[13]The Parent also testified that it would be "hard to say" if M.A. had other adverse symptoms when playing basketball games at other schools because he "would only be in [these buildings for] small blocks of time[,]" not more than "two hours[.]" (Id. at 120-21).

Statement ¶¶ 49-50; Defendant's Statement ¶¶ 49-50).

In December 2009, Dr. Santilli informed the Board that the Parent reported that M.A.'s symptoms always improved when he was away from school on weekends and on summer vacations, and that re-exposure to the allergens could cause his symptoms to worsen.  (Exh. P-120, at 2).  (See also Plaintiffs' Statement ¶ 16; Defendant's Statement ¶ 16).

M.A. received no special education while attending Chase Collegiate from 2006-2010. (FOF ¶ 57)(citations omitted).  When he suffered an allergic reaction he was granted more time or extra help to complete his assignments, an accommodation granted to students in the Torrington High School for regular education.  (Id.)(citations omitted).

G. ADMINISTRATIVE BACKGROUND

1. STUDENT v. TORRINGTON BOARD OF EDUCATION, #07-467

On April 2, 2008, plaintiffs filed a request for a hearing, which was assigned case #07-467.  (HO Decision, at 2 & n.1; see Dkt. #59, Admin. Rec., #07-467 AR-2).[14]  On May 1, 2008, defendant filed a Motion to Dismiss (see Admin. Rec., #07-467 AR-11, at 1-34), which was granted on or about May 27, 2008 on grounds that M.A. was "'parentally-placed' not 'unilaterally placed,'" as M.A. "has not been identified, nor has [he] received any special

_____

[14]On May 25, 2007, defendant Board removed similar litigation brought by plaintiffs and M.A.'s older brother, P.A., against the City of Torrington, defendant Board, and several individuals for failing to provide M.A. and P.A. with a FAPE as a result of defendant's failure to properly maintain Torrington public school buildings.  See P.A. et al.  v. City of Torrington, 3:07 CV 841(AHN).  This 2007 case was filed using the family's last name, but given that abbreviations have been used in this 2010 case, see note 2 supra, only their initials will be used in this ruling.

On March 31, 2008, now retired Senior United States District Judge Alan H. Nevas dismissed plaintiffs' claims in the 2007 case under the Connecticut Constitution and statutes, the IDEA, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, the ADA, and their claim for negligent infliction of emotional distress, and declined to exercise supplemental jurisdiction, remanding plaintiffs' state law claims of intentional spoliation of evidence and fraudulent concealment of evidence to the state court.  2008 WL 905882 (D. Conn. Mar. 31, 2008), recon. denied, 2008 WL 2811517 (D. Conn. July 18, 2008), on remand, 2009 WL 5730556 (Conn. Super. Dec. 21, 2009), aff'd, 133 Conn. App. 215 (App. Ct. 2012).

education services."  (Admin. Rec. #07-467 AR-1, at 1-4; HO Decision, at 2).[15]  Accordingly, the Hearing Officer dismissed the matter on the basis of a lack of jurisdiction, concluding that the Board was an improperly named party, as FAPE was not at issue, but rather the issue was M.A.'s identification and eligibility to receive special education services.  (Admin. Rec., #07-467 AR-1, at 4).  (See also Plaintiffs' Statement ¶¶ 53-55; Defendant's Statement ¶¶ 53-55).

On June 5, 2008, plaintiffs filed their Complaint in this Court, which case was before the late United States District Judge Mark R. Kravitz.  M.A., et al. v. Torrington, et al., 3:08 CV 857(MRK).[16]  On June 23, 2009, in light of the U.S. Supreme Court's decision in Forest Grove School District v. T.A., 557 U.S. 230 (2009), Judge Kravitz remanded the case to the hearing officer  "to reconsider her determination and decide all other issues as necessary." (3:08 CV 857(MRK), Dkts. ##33, 37)).  (See also HO Decision at 2; Plaintiffs' Statement ¶ 56; Defendant's Statement ¶ 56).

## 2. STUDENT v. TORRINGTON BOARD OF EDUCATION, #09-0552 - THE PENDING ACTION

Upon remand from Judge Kravitz, plaintiffs filed a Motion to Amend the issues in the instant case to include the 2008-2009 and 2009-2010 school years, to which was attached plaintiffs' requests for due process hearings, dated March 31, 2008, April 7, 2008, July 8, 2009, and July 15, 2009.  (Admin. Rec. #09-0552, Motion to Amend; HO Decision at 3, n.1). On August 31, 2009, the Hearing Officer concluded that the previous dismissal of #07-467 was "inconsistent with the reasoning in Forest Grove, and that the case involved a matter of

---

[15]As discussed in Section III.A.1 infra, plaintiffs allege in Count Three that defendants' filing of the motion to dismiss in May 2008 prevented them from exercising due process rights to exhaust their administrative remedies and to obtain an administrative due process hearing. (Complaint ¶¶ 65-68, 86-88; see Admin. Rec. #07-467, AR-11).  See note 3 supra.

[16]This 2008 lawsuit also was filed using the family's last name, but again, will be referred to by initials here.  See note 14 supra.

unilateral placement, rather than child find, and ruled that the matter would proceed as a FAPE issue concerning whether [M.A.] should have been identified."  (HO Decision, at 3). The hearing resumed in the remanded case, #09-0552, on September 10, 2009, and on the third hearing date, held on October 27, 2009, the parties were ordered to convene a PPT meeting to consider M.A.'s referral to special education and eligibility for special education services. (FOF ¶ 46 (citation omitted); 10/27/09 Hearing Tr. at 3-4).  (See also Plaintiffs' Statement ¶¶ 53-55; Defendant's Statement ¶¶ 53-55).

### a. PPT ORDERED BY THE HEARING OFFICER

At the PPT meeting held on December 3, 2009, Dr. Santilli recommended an independent evaluation by a physician, and the PPT reviewed a report from Dr. Gregory MacGilpin, head of the upper school  at Chase Collegiate, and reviewed documentation from Waterbury's PPT meetings. (FOF ¶ 47 (citations omitted);  7/14/10 Hearing Tr. at 111).  On December 18, 2009, Dr. Robert Riccio, a consulting psychologist, conducted a cognitive evaluation of M.A. upon the request of Torrington Public Schools.  (7/14/10 Hearing Tr. at 25-26, 31).  M.A.'s psychological evaluation produced scores on the WAIS-IV indicating that M.A. had a full scale IQ of 117, which is considered "high average"; in Verbal Comprehension, his composite score was 118, in Perceptual Reasoning he scored 117, again, "high average[,]" in Working Memory, he scored 119, and in Processing Speed, he scored 94, which is within the average range.  (FOF ¶ 48; see 7/14/10 Hearing Tr. at 37-40).  Throughout the evaluation, M.A's attention and concentration were appropriate, and there was no significant cognitive impact of his allergies on his performance or further indication that he required special education services. (FOF ¶ 48 (citations omitted); see also 7/14/10 Hearing Tr. at 83). Dr. Riccio noted that the results of M.A.'s cognitive evaluation conducted in 2003 were "fairly compatible[]" to the results from December 2009.  (7/14/10 Hearing Tr. at 46-47).  (See also

Plaintiffs' Statement ¶ 16; Defendant's Statement ¶ 16).

M.A. was administered the Woodcock Johnson III Tests of Achievement in a room at Chase Collegiate; he was asymptomatic.  (FOF ¶ 49 (citation omitted); 7/14/10 Hearing Tr. at 35, 37).   His scores indicated that his academic skills were in the average range, application of academic skills was in the high range, fluency with academic tasks was in the average range, broad written language score was in the superior range, and broad reading and math scores were in the average range. (Id.)(citation omitted).

Dr. Beth Robin, the Supervisor of Special Education for Torrington Public Schools (6/29/10 Hearing Tr. at 101), testified that there was no information presented at the PPT that M.A. received special education services at Chase Collegiate; however, she acknowledged that extra time, "close and frequent communications with his parents, and . . . the ability to meet with a counselor[,]" as provided to M.A. was seen as "special education" at Chase. (7/14/10 Hearing Tr. at 100-01, 105, 107).  However, according to Dr. Robin, these "are available to all students in a school whether they [are] special [education] or not." (Id. at 109).

An independent evaluation was conducted by Dr. Marshal Grodofsky, an allergist/immunologist, and a report was released on March 12, 2010.  (FOF ¶ 50 (citations omitted); 6/22/10 Hearing Tr. at 5-8).  Dr. Grodofsky reviewed the charts and reports of Drs. Miller, Randolph and Santilli, as well as M.A.'s  history as he provided and as provided by the Parent, and data from examinations and testing. (Id.)(citation omitted). Dr. Grodofsky reported that at the time of his evaluation in March 2010, M.A's clinical symptoms were significantly controlled, his respiratory problems were stable, and there were no excessive restrictions. (FOF ¶ 51)(citations omitted).  Dr. Grodofsky noted that there was "no real objective data to assess whether the Torrington School System was the major culprit of

17

[M.A.'s] problems" and that there was "no evidence and no reports of the air quality of the Torrington Public School over the last eight years and we have no evidence that [M.A.'s] respiratory symptoms would actually have deteriorated if [M.A.] were in that environment by provocative challenge testing." (Id.)(citation omitted).  (See also Plaintiffs' Statement ¶¶ 20-21; Defendant's Statement ¶¶ 20-21).

Dr. Riccio attended the April 2010 PPT, at which he opined that based on his evaluation, he did not see the need for M.A. to receive specifically designed instruction or special education services prior to graduating high school.  (7/14/10 Hearing Tr. 42-43, 48-49).  Dr. MacGilpin also appeared at the April 2010 PPT.  (See id. at 96).

### b. LEAKING AT TORRINGTON HIGH SCHOOL

The Torrington High School had roof leaks from April 2005 through April 2008 that were remediated in a reasonable manner and time frame. (FOF ¶ 52)(citations omitted). As the Hearing Officer noted, there is insufficient evidence to establish the roof leaks were located in areas that would pose a threat to M.A.'s conditions. (Id.)(citation omitted). The only actual report made of M.A.'s sensitivity to the air quality in the Torrington Public Schools was made by the Parent to Dr. Santilli after the Parent and M.A. walked through the Torrington Middle School in 2003, and M.A. reportedly suffered a severe allergic reaction. (FOF ¶ 53)(citations omitted).  There is no evidence that M.A. was not subjected to other triggering allergens prior to or after his walk through the Torrington Middle School, nor did M.A. ever walk through the Torrington High School. (Id.)(citations omitted).[17]  (See also

---

[17]The Hearing Officer noted in her decision that throughout M.A.'s  years in high school, M.A. could elect to control any allergic reactions with the treatment of Albuterol and/or an antihistamine such as Zyrtec, Claritin or Benadryl; he elected to take Benadryl, instead of Zyrtec or Claritin. (FOF ¶ 54)(citation omitted).  Unlike Zyrtec or Claritin, Benadryl causes excessive drowsiness and affects focus. (Id.)(citation omitted).

Plaintiffs' Statement ¶¶ 25, 29; Defendant's Statement ¶¶ 25, 29).

Dust particles and mold spores to which M.A. is allergic are present in every environment.  (FOF ¶ 55)(citation omitted).  There is insufficient evidence to establish that the Torrington High School had more irritants, dust particles, or mold spores than Chase Collegiate, or that conditions at Torrington High School could exacerbate M.A.'s allergies.  (Id.)(citation omitted).  Though swiftly addressed, there has been water intrusion from recurring leaks at Chase Collegiate. (FOF ¶ 56)(citation omitted). No mold testing has been done in the upper school of Chase Collegiate, no air quality tests have been done within the six years from 2004 through 2010, and there is no evidence that Chase Collegiate has a measurably different environment than Torrington High School. (Id.)(citations omitted).

### c. REMAINDER OF THE HEARING

Subsequent to the remand order from Judge Kravitz, the hearing in #09-0552 convened for thirteen sessions – on September 10, October 8 and 27, December 11, 14 and 16, 2009, June 2, 17, 18, 22, 23 and 29, and July 14, 2010.  (HO Decision at 3; Hearing Transcripts).  The following issues were before the Hearing Officer: whether the Board failed to identify M.A. as OHI qualifying him for special education services for the 2006-2007, 2007-2008, 2008-2009, and 2009-2010 school years, and if so, whether the Board failed to provide M.A. with a FAPE for the 2006-2007, 2007-2008, 2008-2009, and 2009-2010 school years, and if so, whether the parent is entitled to reimbursement for unilateral placement of M.A. at Chase Collegiate for the 2006-2007, 2007-2008, 2008-2009, and 2009-2010 school years. (HO Decision, at 1-2).[18]

---

[18]At the conclusion of the hearing, the Hearing Officer questioned the Parent whether there had been any "formula" put in place as M.A. embarked on college.  (7/14/10  Hearing Tr. at 114-15).   The Parent testified that M.A. was to attend Torrington UConn, which is a "smaller campus[,]" with one building and she and M.A. completed a "simple walkthrough[]" at which time,

d. HEARING OFFICER'S DECISION

On November 15, 2010, the Hearing Officer issued her decision in which she noted that "[a]lthough the evidence clearly establishes that [M.A.] suffers from chronic asthma and other allergies the evidence fails to establish that such conditions adversely affect [his] educational performance."  (HO Decision, at 12).  According to the Hearing Officer, "[t]here is nothing in the record to indicate that the Board failed to comply with the requirements of 34 C.F.R. [§§] 300.300 through 300.311 and CONN. REGS. § 10-76d-9 in the administration of evaluations of [M.A.]."  (Id. at 11).  The Hearing Officer concluded that "absent a finding that [M.A.] should be identified as eligible for special education services, an analysis as to whether the Board provided [M.A.] a [FAPE] or whether unilateral placement was appropriate, warranting reimbursement is not required."  (Id. at 12). Accordingly, the Hearing Officer dismissed the case with prejudice, and plaintiffs commenced  this action on December 1, 2010 against the Board and the City of Torrington.  (Id. at 13; see Complaint).

H. PARTIES' ARGUMENTS

1. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

In their motion, plaintiffs seek summary judgment on the following grounds: that following plaintiffs' repeated requests, defendant failed to hold the IDEA and Section 504 meetings to determine M.A.'s eligibility as to OHI for the 2006-2007, 2007-2008, 2008-2009, and 2009-2010 school years, as alleged in Count One (Dkt. #55, at 1-2; Dkt. #57, at 6-9); similarly, defendant failed to conduct an evaluation to determine M.A.'s eligibility as OHI for those four school years, as alleged in Count Two (Dkt. #55, at 2-3; Dkt. #57, at 9-12); defendant intentionally and wrongfully denied plaintiffs an opportunity for a due process

---

M.A. was no longer receiving immunotherapy.  (Id. at 116, 118).  The Parent had not requested any reports regarding the incursion of water there.  (Id. at 117).

hearing, as alleged in Count Three (Dkt. #55, at 3-4; Dkt. #57, at 12-18); the Hearing Officer wrongfully concluded that the child was not eligible as OHI when the child has "multiple disabilities" that constitute an "adverse affect on his educational performance," when he was entitled to instruction in a "safe school setting[,]" when the "'stay put' provision of the IDEA required his continued placement" at Chase Collegiate, and when the Hearing Officer's decision was not reasoned or supported by the evidence, as alleged in Count Four (Dkt. #55, at 4-6; Dkt. #57, at 18-46); defendant's procedural violations, alone, are sufficient to warrant judgment in plaintiffs' favor (id. at 46-49); the Hearing Officer acted arbitrarily and in abuse of her discretion when she failed to make findings or conclusions of law on all of the issues raised by plaintiffs (id. at 49-52); and the Hearing Officer acted in direct contravention to the purposes and goals of the IDEA in concluding that M.A. did not qualify as OHI.  (Id. at 52-54)

        In its brief in opposition, defendant argues that plaintiffs are not entitled to relief for any claimed procedural violation of the IDEA because any such claims have been waived, defendant did hold PPT meetings and Section 504 meetings, when appropriate, it was hardly "egregious" for defendant not to conduct evaluations of M.A., and Connecticut regulations "explicitly allow" for Motions to Dismiss in these administrative matters (Dkt. #63, at 17-23); defendant properly concluded that M.A. did not qualify for special education services under the category of Other Health Impairment (id. at 23-30); and plaintiffs are not entitled to reimbursement for the unilateral placement at Chase Collegiate.  (Id. at 30-33).

        In their reply brief, plaintiffs characterize defendant's waiver argument as "an outright prevarication[,]" and further argue that despite defendant's "belief[s,]" defendant failed to conduct IEP meetings as requested by plaintiffs, failed to conduct evaluations of M.A. and failed to provide an IEP for M.A., all  indirect violation of IDEA; that M.A. remained eligible under the IDEA as OHI despite the fact that he was advancing from grade to grade each

year; and that M.A. was disabled and was denied FAPE.  (Dkt. #64, at 1-8).

### 2. DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Defendant seeks judgment on the administrative record on grounds that the Board properly determined that M.A. did not have a disability under the IDEA; plaintiffs' claims of procedural violations are waived and the record does not establish such violations, and plaintiffs were not prejudiced by any inadequacies; and, even assuming arguendo that M.A. was eligible for special education services under the IDEA, tuition reimbursement is not warranted in this case.  (Dkt. #58, at 1; Dkt. #38, Brief at 21-32).

In response to defendant's Motion, plaintiffs contend that they did not waive any procedural violations as their arguments were made in their Final Brief to the Hearing Officer (Dkt. #62, at 1-2, 7-13); the Board was "wrong, as a matter of fact and law, when it determined that M.A. did not have a disability under the IDEA[ ]" (id. at 13-26); and plaintiffs are entitled to reimbursement for the unilateral placement at Chase Collegiate. (Id. at 26-44).

### II. STATUTORY FRAMEWORK

The IDEA "'represents an ambitious federal effort' to ensure that all children are given access to a public education regardless of any disabilities they may suffer." A.S. v. Trumbull Bd. of Educ., 414 F. Supp. 2d 152, 169 (D. Conn. 2006), quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. Westchester Cnty v. Rowley, 458 U.S. 176, 179 (1982) ["Rowley"](interpreting the Education for All Handicapped Children Act, subsequently amended and renamed IDEA).  In order for a state to receive federal funding under the IDEA, a state must ensure that "[FAPE] is available to all children with disabilities residing in the State. . . ." 20 U.S.C. § 1412(a)(1)(A).  As the Second Circuit instructs, when reviewing administrative decisions under the IDEA, "a district court must make a two-step inquiry: first, the court must consider whether the state complied with the Act's procedural requirements;

22

second, it must consider whether the IEP is 'reasonably calculated to enable the child to receive educational benefits.'" Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997), quoting Rowley, 458 U.S. at 206-07.  In order to constitute a FAPE, the special education and related services must be "tailored to meet the unique needs of a particular child, 20 U.S.C. § 1401(a)(18), and be 'reasonably calculated to enable the child to receive educational benefits[.]'" Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998), quoting Rowley, 458 U.S. at 207.  A child's eligibility for special education is determined by a local educational agency ["LEA"], which conducts an evaluation.  20 U.S.C. § 1414(a)(1)(A)-(B). When a student is determined to be a "child with a disability" within the meaning of 20 U.S.C. § 1401(3), an "IEP Team," consisting of representatives of the LEA and the child's parents, meets to develop an IEP.  See 20 U.S.C. § 1414(a)(1)(A), (B), (d)(1)-(3).[19] In Connecticut, the IEP Team is referred to as the "PPT."  CONN. AGENCIES REGS. §§ 10-76a-1(14), 10-76d-10.

When parents and a district disagree about what constitutes a FAPE for a child, the parents may enroll their child in a private school without the district's consent and at their own expense, and if the hearing officer or court finds that the proposed program does not provide FAPE, the district may be ordered to reimburse the parents for the cost of the private program.  20 U.S.C. § 1412(a)(10)(C)(ii).  Either party may seek an impartial due process hearing before a state administrative agency, which in Connecticut is the State Department of Education's Bureau of Education, 20 U.S.C. § 1415(f), 34 C.F.R. § 300.507; CONN. AGENCIES

---

[19]An IEP is "a written statement that 'sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives.'" D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507-08 (2d Cir. 2006), quoting Honig v. Doe, 484 U.S. 305, 311 (1988), amended on other grounds, 480 F.3d 138 (2d Cir. 2007); see also 20 U.S.C. §§ 1401(14), 1414(d)(1)(A); CONN. AGENCIES REGS. § 10-76d-11.

REGS. §§ 10-76h-1 to 10-76h-3, and any party dissatisfied with the administrative decision may bring a civil action in state or federal court pursuant to 20 U.S.C. § 1415(i)(2).

### III. DISCUSSION

When a district court decides a summary judgment on an IDEA appeal, the district court is "not dealing with summary judgment in its traditional setting." A.E. v. Westport Bd. of Educ., 463 F. Supp. 2d 208, 214 (D. Conn. 2006)(quotations & citations omitted), aff'd, 251 Fed. Appx. 685 (2d Cir. 2007).  The "court's inquiry is not directed to discerning whether there are disputed issues of fact, but rather whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's educational needs have been appropriately addressed." Id. at 215 (citation omitted).   The district court must review the administrative record, according substantial deference to the hearing officer's findings, before making a determination based on a "preponderance of the evidence[.]" Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005)(citation omitted).  As the U.S. Supreme Court has cautioned, when reviewing an administrative decision in that context, courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review." Rowley, 458 U.S. at 206.  Courts must give "'due weight' to the factual and educational determinations of the hearing officer, 'mindful that the judiciary generally lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'" Plainville Bd. of Educ. v. R.N., No. 3:09-CV-241(RNC), 2012 WL 1094640, at *6 (D. Conn. Mar. 31, 2012)["R.N."], quoting Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ., 397 F.3d 77, 82 (2d Cir. 2005).

In a case in which plaintiffs seek reimbursement for an alternative placement at a private school, the court must engage in a three-step inquiry:

First, we examine whether the state has complied with the procedures set forth in the IDEA. Second, we consider whether the IEP developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits . . . . If . . . the IEP is procedurally or substantively deficient, we proceed to the third step and ask whether the private schooling obtained by the parents is appropriate to the child's needs.

Cerra, 427 F.3d at 192 (internal quotations & citations omitted).

### A. PROCEDURAL VIOLATIONS

"Procedural flaws alone do not automatically require a court to find that a board denied a student a FAPE. Procedural flaws that result in the loss of an educational opportunity, or that seriously infringe the parents' opportunity to participate in the IEP formulation process, however, 'clearly result in the denial of a FAPE.'" A.E., 463 F. Supp. 2d at 216, quoting W.A. v. Pascarella, 153 F. Supp. 2d 144, 153 (D. Conn. 2001). Relief is warranted only if procedural inadequacies "(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of [a FAPE] to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

In this case, plaintiffs assert three procedural violations by the Board: (1) the Board denied the Parent's request for an IEP meeting to determine M.A.'s eligibility for special education under the category of OHI (Complaint, Count One ¶¶ 73-75); (2) the Board failed to conduct any evaluations of M.A. to determine his eligibility (Count Two ¶¶ 79-80); and (3) the Board moved to dismiss the Parent's request for a due process hearing. (Count Three ¶¶ 85-86).[20]

---

[20]Additionally, while plaintiffs allege in their motion that the Board failed to hold Section 504 meetings (Dkt. #57, at 6), this claim was not alleged in the Complaint, was not in the original due process complaint, and was not in the subsequent amended due process complaints, and therefore this claimed procedural violation cannot be considered.

<u>1. BOARD'S MOTION TO DISMISS</u>

Addressing the third procedural violation alleged by plaintiffs, this Court concludes that the Board cannot violate the IDEA by filing a motion to dismiss when such motion is explicitly permitted in the due process procedures.  Specifically, Section 10-76h-8(a) of the Regulations of Connecticut State Agencies permits a party to request that a "hearing officer rule on a motion or take any action consistent with relevant statutes or regulations" provided that the motion is not "used to delay or protract any proceeding."  Motions that are properly before a hearing officer include a motion to dismiss to contest the jurisdiction of the hearing officer.  CONN. AGENCIES REGS. § 10-76h-8(f)(2).  However, for reasons discussed below, the substance of the motion and the Hearing Officer's decision to grant said motion were based on legal error, and as explained to counsel by Judge Kravitz, were contrary to governing Second Circuit law, the result of which was that plaintiffs were improperly denied a due process hearing for nearly two years.  Accordingly, plaintiffs are entitled to judgment as a matter of law on Count Three of her Complaint.[21]

When plaintiffs requested a due process hearing, the Hearing Officer dismissed the case and agreed with the Board that the matter presented a child find issue.[22]  Specifically, in her ruling on the Board's Motion to Dismiss, the Hearing Officer held that:

─────────────────

[21]<u>See</u> note 23 <u>infra</u>.

This conclusion notwithstanding, the Court notes the impossible position of a school board that reasonably relied not only on its legal counsel, but also on a decision of a hearing officer, all of which, unbeknownst to the Board, were contrary to the governing law at that time.

[22]As discussed above, the IDEA creates a duty on the part of the LEAs to identify, locate, and evaluate "all children with disabilities . . . who are in need of special education and related services." 20 U.S.C. § 1412(a)(4)(A)(2000), now § 1412(a)(3)(A).  "This 'Child Find' obligation also applies to '[c]hildren who are suspected of being a child with a disability . . . and in need of special education, even though they are advancing from grade to grade.'" <u>A.P. ex rel Powers v. Woodstock Bd. of Educ.</u>, 572 F. Supp. 2d 221, 224-25 (D. Conn. 2008), <u>quoting</u> 34 C.F.R. § 300.125(a)(2)(ii) (1999), now § 300.131, <u>aff'd</u>, 370 Fed. Appx. 202 (2d Cir. 2010).

Although the Parent argues that she has continually made attempts since 2003 for the Board to identify the Student as [OHI] to qualify the Student as eligible to receive special education services and Section 504 accommodations, one thing is clear.  At the time the Parent made her request for due process on April 2, 2008, the Student had not "previously received special education and related services under the authority of [the Board.]"  Therefore, the Student is considered "parentally-placed" not "unilaterally-placed," as the Student has not been identified, nor has the Student received any special education services.  FAPE is not at issue, but rather, the Student's identification and eligibility to receive special education services is, thereby rendering the Board an improperly named party, and nullifying the hearing officer's jurisdiction over this matter.

(Admin. Rec., 07-467, AR-1, at 4).

Thereafter, when the case was appealed to this Court, <u>M.A. v. Torrington</u>, 3:08 CV 857(MRK), Judge Kravitz convened a telephone conference on January 20, 2009, in which he informed counsel that the "precise question" raised in <u>Forest Grove</u>, "appears to be the question raised by your case, which is does that statute require a parent to have placed the child in public school before it can seek reimbursement for private school tuition[,]" and if the Supreme Court had not granted certiorari in <u>Forest Grove</u>, "this case would be . . . remanded on the basis of <u>Frank G. [v. Bd. of Educ. of Hyde Park</u>, 459 F.3d 356 (2d Cir. 2006), <u>cert. denied</u>, 552 U.S. 985 (2007)]" as the Hearing Officer's decision is "contrary to the law in the Second Circuit." (3:08 CV 857(MRK), Dkt. #36, at 4-5, 11)).  Judge Kravitz continued, "But given the fact that the Supreme Court is now going to resolve this issue once and for all, we should wait . . . for that decision and then see where it takes us." (<u>Id.</u> at 11).

On June 23, 2009, after the issuance of the U.S. Supreme Court's decision in <u>Forest Grove</u>, Judge Kravitz held a second telephone conference in which he informed counsel that: "It seems to me after <u>Forest Grove</u>, a parent can unilaterally, as in the words of the hearing officer, decide that the child is not being offered, given, a fair and appropriate public education and can move the child to private school." (Dkt. #37, at 3).  Judge Kravitz

observed that the hearing officer's dismissal of the underlying case on grounds that "this student had never previously received special education and related services from the [C]ity of Torrington" is erroneous as "after Forest Grove, that is not the law. . . . And it actually wasn't the law at the time of the decision by the hearing officer under Frank G." (Id. at 5).[23]

### 2. FRANK G. V. BD. OF EDUC. OF HYDE PARK

In Frank G., the Second Circuit considered the question of whether the 1997 amendments to the IDEA, 20 U.S.C. § 1400 et seq., established a threshold requirement that a disabled child must have previously received public special education and related services in order to be eligible for reimbursement.  Frank G., 459 F.3d at 368.  20 U.S.C. § 1412(a)(10)(C)(ii) authorizes reimbursement to the parents of a disabled child, "who previously received special education and related services under the authority of a public agency" and who enrolled the child in a private elementary or secondary school without the consent or referral of the private agency, "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to enrollment."  20 U.S.C. § 1412(a)(10)(C)(ii). Just as the Board in this case argues, the defendant in Frank G. asserted:

> Because the authority granted by the subsection applies to the reimbursement of parents of disabled children, "who previously received special education and

_____

[23]Immediately after the case was remanded to the Hearing Officer, the Hearing Officer noted on the record that this is the first time in her fourteen years in that role that she had a decision remanded or overruled.  (Admin. Rec., 09-0552, 9/10/09 Hearing Tr. at 8).  According to the Hearing Officer, while "[t]here is also guidance within the Second Circuit[,]" her initial decision was issued in a "timeframe in which child find has been at issue, and the whole realm of FAPE and unilateral placement and reimbursement for a student who has not been enrolled or identified has been an issue, and it's been found different ways[]" thereby leading "ultimately even the court, the district court," to say "we had to wait to see what the Supreme Court decided[.]" (Id. at 9). However, while Judge Kravitz most appropriately deferred to an anticipated decision by the U.S. Supreme Court on this issue, he made it very clear that even prior to the Forest Grove decision, Frank G. was the governing law in this Circuit, on the basis of which the case still would have been remanded.

> related services under the authority of a public agency," . . . [the statute]
> should be read as implicitly excluding reimbursement to parents who enrolled
> their child in a public or private school before the need for a free and
> appropriate special education manifested itself.  "The clear implication of the
> plain language, however, is that where a child has <u>not</u> previously received
> special education from a public agency, there is no authority to reimburse the
> tuition expense arising from a parent's unilateral placement of a child in a
> private school."

459 F.3d at 367-68 (citation omitted).  In its decision issued in <u>2006</u>, two years before the

Hearing Officer granted the Board's Motion to Dismiss in the 07-467 case, the Second Circuit

disagreed. (<u>See</u> Admin. Rec., 07-467, AR-1, at 4).

Turning to the language of the statute, the Second Circuit observed that "the plain

language" 20 U.S.C. § 1412(a)(10)C)(ii) "does not say that tuition reimbursement is <u>only</u>

available to parents whose child had previously received special education and related

services from a public agency, nor does it say that tuition reimbursement is not available to

parents whose child had not previously received special education and related services."  459

F.3d at 368 (emphasis in original).  Moreover, the Second Circuit then relied upon another

section of the IDEA, 20 U.S.C. § 1415(i)(2)(C), which "authorizes a district court hearing a

challenge to the failure of a local education agency to provide a free appropriate public

education 'to grant such relief as [it] determines is appropriate.'" <u>Id.</u> at 369.  As the Second

Circuit recognized, as did the U.S. Supreme Court in <u>Sch. Comm. of Town of Burlington,</u>

<u>Mass. v. Dept. of Educ. of Commonwealth of Mass.,</u> 471 U.S. 359, 369-70 (1985)

["<u>Burlington</u>"], Congress "undoubtedly did not intend" for parents to have an "empty victory"

if a court tells "'parents [who placed their child in a private school] several years later that

they were right,' yet deny them reimbursement for the placement." <u>Frank G.</u>, 459 F.3d at

369, <u>quoting Burlington</u>, 471 U.S. 370.   The Second Circuit continued that the language of

§ 1412(e)(2), upon which the <u>Burlington</u> decision relied, was unchanged by the 1997

amendments to the IDEA, and "[t]he implication of this subsection is that reimbursement is available where, as here, the agency failed to make a free public education available to the child." Frank G., 459 F.3d at 369-70 (citation omitted).  The Second Circuit concluded that "[a]ll that is required of parents who received an IEP for their child is that they provide the appropriate public agency with reasonable notice that they plan to 'reject [ ] the placement proposed by the public agency to provide a free appropriate education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense.'" Id. at 372.[24]  Conversely, "it is inequitable to permit reimbursement . . . where parents unilaterally arrange for private educational services without ever notifying the school board of their dissatisfaction with their child's IEP." Id. at 376 (citation omitted).

As discussed above, on January 20, 2009, Judge Kravitz brought the Frank G. case to counsel's attention when M.A. v. Torrington, 3:08 CV 857 (MRK) was pending before him, informing counsel that if the U.S. Supreme Court had not granted certiorari in Forest Grove, "this case would be . . . remanded on the basis of Frank G." as the Hearing Officer's dismissal of the 07-467 action was "contrary to the law in the Second Circuit."  (3:08 CV 857(MRK), Dkt. #36, at 4-5, 11)).

### 3. FOREST GROVE SCH. DIST. V. T.A.

Turning next to plaintiffs' first and second counts, four years after the Second Circuit's decision in Frank G., the U.S. Supreme Court considered the precise issue at hand in this case -- namely, whether reimbursement for private education costs is prohibited if a child has not "previously received special education and related services under the authority of a public

---

[24]In Frank G., the parents provided such notice, so that they "would have been free to enroll [their child] in a private school if they had enrolled him first in the [school] provided in the IEP and then removed him thereafter." Id.

agency." Forest Grove, 557 U.S. at 232, quoting 20 U.S.C. § 1412(a)(10)(C)(ii).  Simply put, the U.S. Supreme Court held that there is "no such categorical bar."  Id. at 233.

The student in Forest Grove attended public schools in the Forest Grove School District from kindergarten until the winter of his junior year of high school.  Id. Over the course of his schooling, the student's difficulties in paying attention in class and completing his assignments had increased, and at the end of his freshman year, his parent requested that the school psychologist conduct an evaluation of the student.  Id.  After completing such an evaluation, the psychologist, two other school officials, and the student's mother all agreed that the student did not qualify for special education services.  Id.  Thereafter, during the student's junior year, a private specialist diagnosed the student with ADHD and a number of disabilities related to learning and memory, and this specialist advised the parents to enroll the student at a private academy that focuses on educating students with special needs.  Id. at 233-34.  A few weeks later, after enrolling their son in this private school, the parents requested an administrative due process hearing regarding the student's eligibility for special education services.  Id. at 234.  Just as in this case, "[b]ecause the School District maintained that [the student] was not eligible for special-education services and therefore declined to provide an [IEP], [the] parents left him enrolled at the private academy for his senior year."  Id.  After seeking administrative review, the hearing officer issued a decision finding that the student's ADHD adversely affected his educational performance and the School District failed to meet its obligations under the IDEA in not identifying the student as eligible for special-education services, and because the District did not offer a FAPE, and his private school placement was appropriate, the hearing officer ordered the District to reimburse the parents for the cost of the private-school tuition.  Id. at 234-35.  Upon review, the district court accepted the hearing officer's findings of fact but set aside the

reimbursement award after finding that the 1997 Amendments categorically bar reimbursement of private-school tuition for students who have not "previously received special education and related services under the authority of a public agency." Id. at 235, quoting 20 U.S.C. § 1412(a)(10)(C)(ii).  The Ninth Circuit reversed and remanded for further proceedings.  Id.  at 235-46.  Because of inconsistent holdings among the Circuit courts -- namely, the Second Circuit in Frank G., as well as the Eleventh Circuit in M.M. v. Sch. Bd. of Miami-Dade Cty, Fla., 437 F.3d 1085, 1099 (11th Cir. 2006), previously held that § 1412(a)(10)(C)(ii) does not bar reimbursement for students who have not previously received public special-education services, while the First Circuit in Greenland Sch. Dist. v. Amy N., 358 F.3d 150, 159-60 (11th Cir. 2004) held that reimbursement is barred in such circumstances -- the U.S. Supreme Court granted certiorari and the case was heard at the time that  M.A. brought his initial appeal of the 07-467 administrative decision.

On June 22, 2009, the U.S. Supreme Court held that the District's position that the IDEA only authorizes reimbursement for circumstances in which children have previously received special-education services through public school is "at odds with the general remedial purpose underlying IDEA and the 1997 Amendments."  Forest Grove, 557 U.S. at 244.  As the U.S. Supreme Court explained:

> The express purpose of the Act is to "ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs," § 1400(d)(1)(A) -- a factor we took into account in construing the scope of § 1415(i)(2)(C)(iii), see Burlington, 471 U.S. at 369, 105 S. Ct. 1996.  Without the remedy respondent seeks, a "child's right to a free appropriate education . . . would be less than complete." Id. at 370, 105 S. Ct. 1996.

Id. at 244-25 (emphasis in original).[25]  Accordingly, the U.S. Supreme Court held that the

---

[25]The Supreme Court also observed that, "[t]he District's position similarly conflicts with the IDEA's 'child find' requirement, pursuant to which States are obligated to 'identif[y], locat[e], and

IDEA "authorizes reimbursement for the cost of private special education services when a school district fails to provide a FAPE and the private-school placement is appropriate, regardless of whether the child previously received special education or related services through the public school." Id. at 247.

### 4. APPLICABILITY OF FRANK G. AND FOREST GROVE

As the Hearing Officer acknowledged in her November 15, 2010 decision, this case involves a matter of unilateral placement that "would proceed as a FAPE issue concerning whether the Student should have been identified."  (HO Decision, at 3).  As stated above, Frank G. was the governing precedent from the time it was decided in July 2006, only to be superseded with a consistent holding in Forest Grove four years later.  The first school year challenged at this procedural posture is the 2006-2007 school year.  Therefore, at all times relevant to this case, the holding of Frank G., and later, for the 2009-2010 school year, the holding of Forest Grove, govern this case.  The Board disregarded, or was inexplicably unaware of, this controlling precedent in the 2006-2007, 2007-2008, 2008-2009 school years, was informed of the applicability of Frank G. in January 2009 by Judge Kravitz, and yet did not convene a PPT until December 3, 2009, when ordered to by the Hearing Officer when the case was remanded by Judge Kravitz.  Even with this procedural history, the Board maintains that it "complied with the procedural requirements of the IDEA, and/or at a minimum, acted reasonably in denying J.A.'s requests for PPT meetings on the understanding that this was a matter of child find, and then thereafter relying on the hearing officer's dismissal in the original case, 07-467." (Dkt. #63, at 18)(citation omitted).  However, the Board's actions

---

evaluat[e]' '[a]ll children with disabilities residing in the State' to ensure that they receive needed special-education services." Id. at 245 (alterations in original), quoting 20 U.S.C § 1412(a)(3)(A); see 20 U.S.C. § 1412(a)(10)(A)(ii).

were contrary to governing Second Circuit precedent.

Not only was Frank G., and later Forest Grove, the controlling law on this issue at all times relevant to this case, but the law in this Circuit is clear that "a school district has a continuing responsibility to develop an IEP even after a student has been parentally placed in private school." Doe v. East Lyme Bd. of Educ., Civ. No. 3:11 CV 291 (JBA), 2012 WL 4344301, at *6 (D. Conn. Sept. 21, 2012)["East Lyme"], citing R.N., 2012 WL 1094640.  In this case, the Parent continued to request PPT and 504 meetings on March 26, 2007, March 31, 2008, September 22, 2008 and July 8, 2009, for the school years at issue -- 2006-2007, 2007-2008, 2008-2009 and 2009-2010, respectively.  (FOF ¶¶ 34, 38, 41, 44)(citations omitted).  In each of these requests, the Parent requested eligibility under the IDEA under the "other health impaired" category, and accommodations under Section 504 for the Student, and the Parent indicated that the Student was unilaterally placed at Chase Collegiate during the relevant years.  (Id.)(citations omitted).[26] As stated above, in response to each of these requests, Judith Babcock, Director of Student Services for Torrington, interpreted the IDEA to require the town in which the private school is located to be responsible for the Student's IEP, and therefore directed the Parent to request a PPT meeting from Waterbury Public Schools.  (Id. ¶¶ 35, 39, 42, 45)(citations omitted).  However, the language of the IDEA "makes clear that where parents request reevaluations of their child for purposes of having an offer of a FAPE made for him, and the child is domiciled in the district, the school district must comply." Moorestown Twp. Bd. of Educ. v. S.D., 811 F. Supp. 2d 1057, 1069

---

[26]As discussed above, the Section 504 team convened meetings in December 2003, September, October and December 2004, and October 2005, and convened PPT meetings in December 2003 and February 2004.  (Id. ¶¶ 17-18, 20, 22, 28-29, 31)(citations omitted). At the conclusion of these meetings, the Student was informed that he was ineligible for Section 504 accommodations because he did not have an impairment that substantially limited one or more major life functions.  (Id. ¶¶ 17, 20, 23, 29, 31; see id. ¶ 32)(citations omitted).

(D.N.J. 2011).  "[R]esidency, rather than enrollment, triggers a district's FAPE obligations."
Id.  Thus, in accord with the "case law in this circuit," defendant had a "continuing responsibility to develop an IEP even after [M.A.] ha[d] been parentally placed" at Chase Collegiate.  East Lyme, 2012 WL 4344301, at *6.

Moreover, even when the Board in this case viewed this as a "child find" issue, thereby believing it to be the responsibility of Waterbury and not Torrington, the Board still bore an obligation to plaintiffs under the IDEA.  The IDEA provides that "[a]ll children with disabilities residing in the State . . . who are in need of special education and related services [must be] identified, located and evaluated . . . ." 20 U.S.C. § 1412(a)(3)(A). Moreover, as stated in the IDEA:

> (A) A State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability . . .

> (B) . . . either a parent of a child, or a State educational agency, or local educational agency may initiate a request for an initial evaluation to determine if the child is a child with a disability.

> (C) . . . [The] initial evaluation shall consist of procedures –

>> (I) to determine whether a child is a child with a disability . . . within [sixty] days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted, within such time frame; and

>> (II) to determine the educational needs of such child.

20 U.S.C. § 1414(a)(1).  While recognizing that the district in which the private school resides has its own child find responsibilities,[27] the "child find process does not prevent a parent from

---

[27]A school district may have a child find obligation for students who attend a school within the district but who reside in another school district or another state.  34 C.F.R. § 300.131(a), (f).

initiating a request for an evaluation from the LEA of residence or relieve the LEA where the child resides from the obligation to provide an evaluation." District of Columbia v. Abramson, 493 F. Supp. 2d 80, 85 (D.D.C. 2007)["Abramson"].  "Indeed," in the words of the Abramson court, 20 U.S.C. § 11414(a)(1)(B) "expressly provides that parents may initiate such a request[,]" and just because Waterbury may have child find responsibilities of its own, and just because the Student was enrolled outside of Torrington, the Board is not relieved "from having to fulfill its own responsibilities as the LEA of residence to evaluate the student and make FAPE available."  Abramson, 493 F. Supp. 2d at 85-86 (citation omitted); accord Regional Sch. Dist. No. 9 Bd. of Educ. v. Mr. & Mrs. M., No: 3:07 CV 1484(WWE), 2009 WL 2514064, at *15 (D. Conn. Aug., 11, 2009)(Student's placement in Utah did not divest school district in Connecticut of its IDEA obligations to student-resident); see also E.T. v. Bd. of Educ. of the Pine Bush Cent. Sch. Dist., No 11-CV-5510(ER), 2012 WL 5936537, at *11 (S.D.N.Y. Nov. 26, 2012).  The Board's "refusal to continue the evaluation process for [M.A.], a resident of [Torrington], constituted a denial of FAPE."  Abramson, 493 F. Supp. 2d at 86.[28]

Moreover, in Forest Grove, the U.S. Supreme Court recognized that "a school district's failure to propose an IEP of any kind is at least as serious a violation of its responsibilities under the IDEA as a failure to provide an adequate IEP."  557 U.S. at 238-39.  As Judge Arterton concluded last year in East Lyme, "[b]y failing to convene a PPT for [the requisite

---

[28]The Hearing Officer noted in her decision that on August 31, 2009, after Judge Kravitz remanded the #07-467 case, she "ruled that case 07-467 (now case #09-0552) was to be reviewed as a matter of unilateral placement, not child find.  Thus the district responsible for identifying the Student was the Torrington Board of Education."  (HO Decision, at 8, n.6). However, contrary to the foregoing discussion, the Hearing Officer continued, "[i]n the interim, the Board justly denied the Parent's requests for PPT meetings in reliance upon the undersigned's preliminary determination prior to remand that this was a matter of child find."  (Id.).  This too is a misstatement of the governing law as the Hearing Officer's "preliminary determination" was contrary to Frank G., the governing Second Circuit law.  See also Abramson, 493 F. Supp. 2d at 85-87.

years at issue,] [d]efendant denied [the Parent] the opportunity to participate in the development of her son's IEP, and violated [p]laintiff's right to a FAPE." East Lyme, 2012 WL 4344301, at *7.  Accordingly, plaintiffs are entitled to judgment as a matter of law on Counts One and Two.[29]

### B. DETERMINATION OF ELIGIBILITY FOR SPECIAL EDUCATION SERVICES UNDER THE CATEGORY OF OTHER HEALTH IMPAIRMENT

Local boards of education are responsible for identifying children with disabilities. CONN. REGS. § 10-76d-6.  To determine if a student is eligible for special education and related services, a board must conduct a "full and individual initial evaluation[.]"  20 U.S.C. § 1414(a)(1)(A).[30]  The evaluation shall include "reports concerning the child's educational progress, structured observation, and such psychological, medical, developmental and social evaluations as may be appropriate," as well as "a variety of assessment tools and strategies to gather relevant information provided by the parent."  20 U.S.C. § 1414(b)(2)(A); CONN. REGS. § 10-76d-9(a).  Where there is existing data, the evaluation must include a review of the existing data, including evaluations and information provided by the parents of the child; current classroom-based assessment and observations; and teacher and related services providers' observations.  20 U.S.C. § 1414(c)(1).

The IDEA Regulations define "other health impairment" as: "having limited strength, vitality, alertness, including a heightened alertness to environmental stimuli, that results in

---

[29]The issue of damages will be addressed in Section III.C. infra.

[30]While a district court is "expected to give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lacks the specialized knowledge and experience to resolve persistent and difficult questions of educational policy[,]'" Walczak, 142 F.3d at 129 (alteration & quotations omitted), "no deference is required where, as here, the district court is presented with the threshold question of a child's statutory eligibility for special educations services; to wit, whether the child was disabled." C.B. ex rel Z.G. v. Dept. of Educ. of City of NY, 322 Fed. Appx. 20, 21 (2d Cir. 2009), citing Muller v. Comm. on Special Educ. of East Islip Free Sch. Dist., 145 F.3d 95, 102 (2d Cir. 1998).

limited alertness with respect to the educational environment," that is "due to chronic or acute health problems such as asthma, . . . " and "[a]dversely affects a child's educational performance." 34 C.F.R. § 300.8(c)(9). "[N]either the IDEA nor the federal regulations define the term[ ] . . . 'adverse effect on educational performance,' leaving it to each State to give substance to these terms." J.D. ex rel J.D. v. Pawlet Sch. Dist., 224 F.3d 60, 66 (2d Cir. 2000). The Second Circuit has assessed "educational performance" by reference to academic performance. See Maus v. Wappingers Cent. Sch. Dist., 688 F. Supp. 2d 282, 297 (S.D.N.Y. 2010); see Mr. & Mrs. N.C. v. Bedford Cent. Sch. Dist., 300 Fed. Appx 11, 13 (2d Cir. 2008)(finding that even if the student displayed characteristics of an emotionally disturbed child, his educational performance was not adversely affected where he did not fail any classes at school and his grade point average dropped only nine points).  As the U.S. Supreme Court has instructed, while not "every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a [FAPE]," Rowley, 458 U.S. at 203, n. 25, "[t]he grading and advancement system . . . constitutes an important factor in determining educational benefit." Id. at 203; see A.J. v. Bd. of Educ., 679 F. Supp. 2d 299, 311 (E.D.N.Y. 2010)(relying on Second Circuit precedent, the district court concluded that because the child performed well in school despite his disorder, plaintiffs failed to demonstrate, by a preponderance of the evidence, that the child's educational performance was adversely affected).

The first day of hearing on the remanded case was September 10, 2009, and during the hearing on October 27, 2009, the parties were ordered to convene a PPT meeting to consider M.A.'s referral to special education and eligibility for special education services.  (FOF ¶ 46)(citation omitted).  The PPT meeting reconvened on December 3, 2009, at which meeting  Dr. Santilli informed the Board that Parent reported that M.A.'s symptoms always

improved when he was away from school on weekends and on summer vacations, and that re-exposure to the allergens could cause his symptoms to worsen.  (FOF ¶ 47 (citations omitted); see also Exh. P-120, at 2).  Dr. Santilli recommended an independent evaluation by a physician, reviewed a report from Dr. MacGilpin, and reviewed documentation from Waterbury's PPT meetings. (FOF ¶ 47)(citations omitted).

On December 18, 2009, Dr. Riccio conducted a cognitive evaluation of M.A. upon the request of Torrington Public Schools. (7/14/10 Hearing Tr. at 25, 31).   M.A's psychological evaluation produced scores on the WAIS-IV indicating that M.A. had a full scale IQ of 117, which is considered "high average"; in Verbal Comprehension, his composite score was 118, in Perceptual Reasoning he scored 117, again, "high average[,]" in Working Memory, he scored 119, and in Processing Speed, he scored 94, which is within the average range.  (FOF ¶ 48 (citation omitted); 7/14/10 Hearing Tr. at 37-40).  Throughout the evaluation, M.A's attention and concentration were appropriate, and there was no significant cognitive impact of his allergies on his performance or further indication that he required special education services. (FOF ¶ 48 (citation omitted); 7/14/10 Hearing Tr. at 83).  Dr. Riccio noted that the results of M.A.'s cognitive evaluation conducted in 2003 were "fairly compatible" to the results from December 2009.  (7/14/10 Hearing Tr. at 46-47).   (See also Plaintiffs' Statement ¶ 16; Defendant's Statement ¶ 16).

M.A. was administered the Woodcock Johnson III Tests of Achievement in a room at Chase Collegiate; he was asymptomatic.  (FOF ¶ 49 (citation omitted); 7/14/10 Hearing Tr. at 35, 37).   His scores indicated that his academic skills were in the average range, application of academic skills was in the high range, fluency with academic tasks was in the average range, broad written language score was in the superior range, and broad reading and math scores were in the average range. (Id.)(citation omitted).

Dr. Robin testified that there was no information presented at the PPT that M.A. received special education services at Chase Collegiate; nonetheless, the extra time, "close and frequent communications with his parents, and . . . the ability to meet with a counselor[,]" as provided to M.A. was seen as "special education" at Chase Collegiate. (Id.; 7/14/10 Hearing Tr. at 100-01, 105, 107).  However, according to Dr. Robin, these "are available to all students in a school whether they [are] special [education] or not." (Id. at 109).[31]  Moreover, Dr. Robin recounted that Dr. MacGilpin, the Chase Collegiate representative, had testified at the PPT that M.A. was in the lower third of class, he sometimes did not get his homework in, but he was within average performance, and he was taking advanced placement English, was on the college preparatory track, was attentive, and had good clarity of thought and speech.  (6/29/10 Hearing Tr. at 128).  Dr. Robin further testified that M.A. met with one of the two special education teachers at Chase Collegiate, but M.A. did not feel that he needed help from the special education teachers so he never met with them again.  (Id. at 129).[32]

Dr. Riccio attended the April 2010 PPT, at which he opined that based on his evaluation, he did not see the need for M.A. to receive specifically designed instruction or special education services prior to graduating high school.  (7/14/10 Hearing Tr. 42-43, 48-

---

[31]Dr. Robin also indicated that the Parent placed limitations on the evaluations of M.A. and his progress at Chase Collegiate, specifically "not authoriz[ing] any medical provider or anyone at Chase Collegiate . . . to verbally discuss anything regarding [M.A.], unless and until the verbal discussion takes place with the parents and/or the parents' attorney present."  (6/29/10 Hearing Tr. at 117).

[32]Based on the testimony of Dr. Robin and others, the Hearing Officer concluded that M.A. received no special education while attending Chase Collegiate from 2006-2010. (FOF ¶57)(citations omitted). When he suffered an allergic reaction, he was granted more time or extra help to complete his assignments, an accommodation given to students in the Torrington High School for regular education. (Id.)(citations omitted).

49).[33]   Similarly, Patricia Porch, a special education teacher at Torrington High School who was present at the PPT for the discussions related to M.A. being referred to special education, testified before the Hearing Officer that based on her discussions with Dr. MacGilpin, Chase Collegiate's representative, M.A. "was succeeding in his place of education and he had no problems as far as passing classes and so forth, being able to meet the standards for receiving adequate to above adequate grades." (6/23/10 Hearing Tr. at 4, 7-10).  Based on the cognitive and achievement testing results (id. at 10-16), Porch did not believe that M.A. was eligible for special education services, nor did she think he "fit under . . . OHI[]" because "medically . . . he was stabilized and . . . his flare ups were not present[,]" he participated in sports year-round, and had good attendance. (Id. at 18-19, 23).

While in the ninth grade,[34] M.A. received immunotherapy and his allergies were controlled with the use of an Albuterol inhaler, as needed, and Benadryl[35] taken for seasonal allergies. (FOF ¶ 33)(citation omitted).  M.A. had no restrictions on physical activities. (Id.) (citation omitted).[36]   While in tenth grade during the 2007-2008 school year, M.A. had

--------

[33]Dr. MacGilpin also appeared at the April 2010 PPT.  (See id. at 96)

[34]Plaintiffs and the Hearing Officer address M.A.'s asthma diagnosis in 2001, plaintiffs' request for potential Section 504 accommodations to be made prior to M.A.'s sixth grade year, in 2003, at Torrington Middle School, and the 2004 and 2005 Section 504 Team meetings.  (See Dkt. #57; FOF ¶¶ 1-32 (citations omitted)).  The Court discussed this background in Section I.A. supra; however, the issues relevant to the pending case are the school years 2006-2007, 2007-2008, 2008-2009, and 2009-2010.  The Court will focus its discussion accordingly.

[35]As mentioned earlier, the Hearing Officer noted in her decision that throughout M.A.'s years in high school, M.A. could elect to control any allergic reactions with the treatment of Albuterol and/or an antihistamine such as Zyrtec, Claritin or Benadryl; he elected to take Benadryl, instead of Zyrtec or Claritin. (FOF ¶ 54)(citation omitted).  Unlike Zyrtec or Claritin, Benadryl causes excessive drowsiness and affects focus. (Id. (citation omitted); see 6/17/10 Hearing Tr. at 145).  The Parent testified that M.A's "fogginess" was a symptom of his asthma and allergies. (10/8/09 Hearing Tr. at 59).

[36]As discussed above, in his ninth, tenth, eleventh and twelve grade years, plaintiffs requested Section 504 and PPT meetings from defendant (see id., FOF ¶¶ 34, 38, 41, 44)(citations omitted), and were referred to Waterbury Public Schools, which did conduct such meeting in May

perennial allergies that were controlled with immunotherapy, and continued to take Benadryl and Albuterol as needed.   (FOF ¶ 37)(citations omitted).   He participated in indoor and outdoor interscholastic sports in home and away games without difficulties or restrictions. (Id.)(citation omitted).   While in the eleventh grade during the 2008-2009 school year, M.A. continued to use Albuterol as needed, and participated in indoor and outdoor interscholastic sports in home and away games without difficulties or restrictions. (FOF ¶ 40)(citation omitted). While in twelfth grade during the 2009-2010 school year, M.A's allergies improved significantly, he was no longer receiving immunotherapy and had no restrictions on activities, was no longer taking Albuterol, and took Benadryl for allergies on an as needed basis.   (FOF ¶ 43)(citations omitted).   M.A. participated in indoor and outdoor interscholastic sports in home and away games without difficulties or restrictions. (Id.)(citation omitted); (see also 7/14/10 Hearing Tr. at 118-20 (Parent testified that M.A. played basketball and lacrosse and was only limited by a sprained ankle in basketball, and a lack of skill in lacrosse; he had no asthma attacks)).[37]

In this case, as in C.B. ex rel Z.G. v. Dept. of Educ. of City of NY, 322 Fed. Appx. 20 (2d Cir. 2009)["C.B."], M.A. "continuously performed well," tested in the average or above grade-level, and his "educational performance has [not] suffered."  Id. at 22.  In that case, the Second Circuit held that "[t]he evidence on the record is insufficient to show that [the

---

and September 2007 (FOF ¶¶ 35-36, 39, 42)(citations omitted), at the conclusion of which they found that M.A. was functioning and progressing without special education and declined to place M.A. at Chase Collegiate. (FOF ¶ 36)(citations omitted).

As the Parent acknowledged, she took the position at the May 2007 PPT in Waterbury that M.A. was doing well in school, getting good grades and did not require any special services, a stance which is completely at odds with her arguments here.  (10/8/09 Hearing Tr. at 234-35).

[37]The Parent also testified that it would be "hard to say" if M.A. had other adverse symptoms when playing basketball games at other schools because he "would only be in [these buildings for] small blocks of time[,]" not more than "two hours[.]" (Id. at 120-21).

child] has suffered an adverse impact on her educational performance[,]" and that accordingly, she had not established an eligibility for services under the IDEA.  Id.  Similarly, in N.C., the Second Circuit held that even if the plaintiffs in that case could establish that their son was emotionally disturbed under New York's regulations, he would not qualify for special education services because there was "insufficient evidence that [the child's] educational performance was adversely affected[,]" as the child "did not fail any of his classes[.]" 300 Fed. at 13 (citation omitted). In A.J., the district court analyzed that the "import" of N.C. and C.B. is that "'educational performance' must be assessed by reference to academic performance which appears to be the principal, if not only, guiding factor."  679 F. Supp. 2d at 309 (citation omitted).   Just as in A.J., in this case, it may be "implied from [p]laintiffs' arguments that [M.A.'s] educational performance" was hampered by [his conditions] such that he [was] unable to reach his maximum academic potential[.]" Id.  However, just as in this case, the child in A.J. "was performing at average to above average levels in the classroom and was progressing academically." Id. at 311.  Accordingly, the court concluded that his condition "was not affecting his educational performance in an adverse or unfavorable way[,]" so that he was not eligible for services under the IDEA.  Id.  Following the guidance of the Second Circuit and courts therein, this Court, having looked at "[M.A.'s] academic performance . . . to assess whether [he] is eligible for special education services under IDEA[,]" concludes that M.A. was not eligible for special education services.  Maus, 688 F. Supp. 2d at 298.

Moreover, as of the time M.A. entered high school, the years at issue in this case, M.A.'s condition was controlled and he had no restrictions on his activities, and by his senior year, he no longer received immunotherapy, he last saw Dr. Santilli prior to September of his senior year, and prior to that, M.A. was only seen by Dr. Santilli, "[t]wo or three times."  (FOF

¶ 43 (citation omitted); 6/17/10 Hearing Tr. at 93).  See Parker v. Friendship Edison Public Charter Sch., 577 F. Supp. 2d 68, 75 (D.C. Cir. 2008)(while exhibiting symptoms of ADHD, student's developmental history did not support a diagnosis of ADHD at that time; thus, student would not qualify for special education services).[38]  This notwithstanding, plaintiffs contend that "[a]s a matter of law, a medical recommendation for the child  to avoid a public school constitutes an adverse affect on the child's educational performance, such that the child is eligible as [OHI]."  (Dkt. #57, at 21, 25, citing Weixel v. Bd. of Educ. of the City of New York, 287 F.3d 138, 151 (2d Cir. 2002)).  Plaintiffs' argument cannot succeed for at least two reasons.  First, plaintiffs' reading of Weixel is not as broad as they posit.[39]  Second, unlike the facts at issue in Weixel, Dr. Santilli's advice to M.A. to go to "another school[,]" was made in 2003, at least three years before M.A. started high school, was made without M.A. having ever stepped inside the high school building, and was made without M.A. ever complaining of or experiencing any symptoms from exposure to the high school building.  (6/2/10 Hearing Tr. at 109-11; FOF ¶ 53 (citations omitted)).   (See also Plaintiffs' Statement ¶¶ 25, 29; Defendant's Statement ¶¶ 25, 29).

The Second Circuit's holding in Weixel did not rely on a "medical recommendation for

---

[38]As discussed further below, there is simply insufficient evidence that M.A. suffered from "limited strength, vitality, or alertness," a prerequisite of an "OHI" diagnosis for a "chronic or acute health problem[] such as asthma. . . .".  See 34 C.F.R. § 300.8(c)(9).

[39]In Weixel, during the second week of January 1994, when she was twelve years old and in seventh grade, the student became "chronically sick with infected tonsils, swollen glands, muscle and joint pains, headaches, nausea, abdominal pains, exhaustion, and intermittent fever[,]" so that she could not climb stairs in school and would need to lie down if she felt in need of rest.  287 F.3d at 142.  After being "forced to climb" stairs in school, and left on a chair doubled-over in pain in the school office, the student's pediatrician documented the student's "disability and inability to attend school."  Id.   The child was home schooled for the rest of the school year, was not permitted to return for eighth grade in September 1994, and then remained with home schooling for the balance of the 1994-1995 school year.  Id. at 143-44.  Nowhere in the Second Circuit's brief discussion of IDEA, id. at 149-50, is there any mention of the proposition for which plaintiffs twice cited the decision.

the child to avoid a public school."  Rather, in Weixel, the Second Circuit concluded that student, who was undisputedly "not learning disabled[,]" suffered from an OHI which required "special education and related services[,]" in that she "had disabling physical ailments that limited her strength, vitality and alertness and made it impossible for her to attend school[,]" and thus she required "special education" in the "form of home instruction." 287 F.3d at 150. That notwithstanding, plaintiffs urge reliance on Dr. Santilli's testimony as conclusive support that M.A.'s attendance at Torrington High School during the relevant years would have an adverse affect on M.A.'s educational performance.

At the hearing held on June 2, 2010, Dr. Santilli testified that after M.A. was diagnosed with asthma in 2001, followed by a diagnosis of asthma and rhinitis in 2003 by both Drs. Randolph and Santilli, Dr. Santilli believed that "at that particular point in time[] . . . the best thing would be to disperse [M.A.] to another school. . . . Go to another school district." (6/2/10 Hearing Tr. at 108-09, 110-11; but see id. at 118 (illness diagnosed in October 1998)).[40]  He acknowledged that he did not have any direct evidence of water-damage to the school buildings, but based his opinion that M.A. has been exposed to mold in the indoor air environment at Torringford Elementary School on the history provided by the Parent.  (6/17/10 Hearing Tr. at 71-72).  Moreover, while conceding that he did not do any air quality testing at the Torringford Elementary School (id. at 55-56), he testified that he based his conclusion that there was "toxic mold exposure at school" on "the fact that there was water damage in the building" and, that his "evidence [of that mold damage] was

---

[40]Dr. Santilli's opinion relating to M.A. was based in part on his experience with M.A.'s older brother, P.A.,  and the "irreversibility of [P.A.'s] asthma[,]" especially after attending Torrington Middle School and Torrington High School "[f]or a while. . . ." (Id. at 114-15).  See note 45 infra.

[P.A.]."[41]  (Id. at 68).   Dr. Santilli also testified that while M.A. is allergic to several allergens including animals, indoor and outdoor molds, dust mites, trees and pollen, he never asked where M.A. spent his time when he was not at school because "of the fact that the history suggested that it was during the school year where the major problems were."  (Id. at 58-59).  His "recollection" was that he told the Parent, "based on [P.A.] and based on what I knew and based on other patients and teachers, she's absolutely crazy if she sends him to the middle school."  (Id. at 59).[42]

Dr. Santilli also testified that people who are allergic to outdoor mold in the fall, "get a little brain foggy," (6/2/10 Hearing Tr. at 123), and teachers have reported to Dr. Santilli that their students' "performance is definitely impacted [when] their allergies are bad[,]" (id. at 124), such that "environment control is absolute[ly] paramount for a child like this[]" who is "very sensitive to indoor mold, outdoor mold, pollens, [and] animals."  (Id. at 131).   Dr. Santilli's "opinion was that [M.A.] should avoid that school [Torrington High School], period."  (Id. at 148).  As discussed above, M.A. never set foot in the high school, which is the school at issue during the years relevant to this Court's consideration.

In 2010, an independent evaluation was conducted by Dr. Grodofsky, which culminated in a report released on March 12, 2010.  (FOF ¶ 50)(citations omitted).  Dr. Grodofsky reviewed the charts and reports of the other doctors, as well as M.A.'s history as he provided and as provided by the Parent, and data from examinations and testing.  (Id.)

---

[41]See note 40 supra and note 45 infra.

[42]Dr. Santilli also testified that he did not recommend that M.A. attend Chase Collegiate.  (Id. at 154; see also id. at 158 ("I've never recommended anybody to attend private schools.")).  He was aware that there have been water leaks and water intrusion at Chase Collegiate as well but he testified that there was "prompt remediation."  (Id. at 155).  Once again, the Court notes that these opinions relate to M.A.'s. middle school years, not high school years, the latter of which are the only years at issue in this case.

(citations omitted). Dr. Grodofsky reported that at the time of his evaluation in March 2010, M.A's clinical symptoms were significantly controlled, his respiratory problems were stable, and there were no excessive restrictions. (FOF ¶ 51)(citation omitted).  Dr. Grodofsky noted that there was "no real objective data to assess whether the Torrington School System was the major culprit of [M.A.'s] problems" and that there is "no evidence and no reports of the air quality of the Torrington Public School over the last eight years and we have no evidence that [M.A.'s] respiratory symptoms would actually have deteriorated if [M.A.] were in that environment by provocative challenge testing." (Id.)(citation omitted).  (See also Plaintiffs' Statement ¶¶ 20-21; Defendant's Statement ¶¶ 20-21).

Torrington High School had roof leaks from April 2005 through April 2008 that were remediated in a reasonable manner and time frame. (FOF ¶ 52)(citations omitted). David Bascetta, the Director of Facilities for defendant, testified that the roof to the high school was replaced over a period of three years and was completed in 2005 or 2006.  (12/11/09 Hearing Tr. at 4, 148-50; 6/18/10 Hearing Tr. at 7, 24-25).  Bascetta testified regarding a "hole . . . probably no bigger than a pebble[,]" in the small rubber part of the roof connection between the building and cafeteria that was discovered due to a water stain and has been repaired. (12/11/09 Hearing Tr. at 135-37).  He further testified as to leaks in the roof over the music wing, library and building connector, that were repaired during the 2006-2007 school year, as well as a puddle from a wall of windows on the first floor in the stairwell entrance (water fell on a rubber mat and was quickly mopped up), and some leaking in the northwest corner of the library and wet tiles in the ceiling between the music wing as well; he described all of them as "seasonal[,]" due to severe rain or severe snow on the school's flat roof.  (Id. at 139-46; 6/18/10 Hearing Tr. at 51-57; see also 12/11/09 Hearing Tr. at 146-48 (regarding bills paid for roof repair)).

47

Bascetta acknowledged that some of the ceiling tiles were stained, but explained that these leaks came from propylene glycol (that serves as an antifreeze to keep the pipes from freezing), rather than water (6/18/10 Hearing Tr. at 32-33), that "nine times out of ten[,]" the leaks in the school were not from the roof, but from a pipe (id. at 45), and that the affected ceiling tiles were the only porous material that would need to be removed.  (Id. at 40-41).  Except for carpeting in the media center and main office of the school, all the other floors are composed of non-porous materials, which resist mold.  (Id. at 42-43, 51 (the flooring in the classrooms is non-porous vinyl composite tile, the air condition pipes are wrapped with a condensation barrier, and the windows are made of non-porous materials)).[43] The high school has had no systemic problems related to mold (id. at 57-58), and no complaints as to the air quality.  (Id. at 65).  (See also Plaintiffs' Statement ¶ 29; Defendant's Statement ¶ 29).

The Torrington High School nurse, Nancy Amrich, testified that based on her

---

[43]Plaintiffs misstate Bascetta's testimony in support of their claim that the record is "replete with evidence of the conditions of the Torrington High School and Middle School and the reasons why medical professionals deemed the child's attendance at those schools to be medically contraindicated." (See Dkt. #57, at 30-32).

Additionally, plaintiffs rely on the testimony of a senior at Torrington High School who was quoted in a newspaper article as saying, "If you've been to the bathrooms [at the High School] I don't need to say anything else," and "If you've been in the school on a rainy day you're dodging buckets." (6/2/10 Hearing Tr. at 56-58; Dkt. #57, at 32-33).  However, this student also testified that:

> It was more of a sarcastic quote.  Sure, there have been buckets for a few minor leaks, but never anything major.  You're not stumbling over people getting around buckets or anything. . . .

> [This would occur] only when it's raining for a substantial period of time. It's not like every single time it starts to rain.  Only if we've had quite a few days of rain, just something like that. . . .

> It's not a common occurrence by any means. . . .

(Id. at 58).

experience as a nurse working in the high school building, the school is neither damp nor moldy, and until her retirement in December 2007, she did not see leaks, nor was she aware of any leaks.  (6/29/10 Hearing Tr. 9-10, 91, 94-95). As the Hearing Officer noted, there is insufficient evidence to establish the roof leaks were located in areas that created conditions that would pose a threat to M.A.'s conditions. (FOF ¶ 52)(citations omitted). The only actual report made of M.A.'s sensitivity to the air quality in the Torrington Public Schools was made by the Parent to Dr. Santilli after the Parent and M.A. walked through the Torrington Middle School in 2003, and M.A. reportedly suffered a severe allergic reaction. (FOF ¶ 53)(citations omitted).[44]   Dr. Santilli testified that M.A. "had a problem in the building and that validated why [Dr. Santilli] didn't want [M.A.] in the building even further."  (6/2/10 Hearing Tr. at 144).   As the Hearing Officer properly noted, there is no evidence that M.A. was not subjected to other triggering allergens prior to or after his walk through the Torrington Middle School, nor did M.A. ever walk through the Torrington High School. (FOF ¶ 53)(citations omitted). Yet, Dr. Santilli testified that M.A.'s symptoms were caused by mold exposure at Torrington Middle School even though he never attended the school and was only in the building on one brief occasion, but once he was sensitized to the mold, he was "stuck with it." (6/17/10 Hearing Tr. at 136, 138).  And again, this testimony relates to M.A.'s reaction to the middle school, not the high school at issue in this case.

Dr. Santilli also testified that his familiarity with the high school building is not based

---

[44]Although M.A. never did a "walk-through" at the high school, he did a "walk-through" at the middle school over the course of one hour in 2003 upon the suggestion of Dr. Santilli, and M.A. immediately reacted with a scratchy throat, nasal congestion, and red and tearing eyes.  (10/8/09 Hearing Tr. at 76-77).

As repeatedly discussed above, this case addresses M.A.'s four high school years. Thus, whether and what reaction M.A. may have had in the middle school in 2003 has no bearing on M.A.'s ability to attend Torrington High School from 2006 through 2010.

on his first-hand knowledge but rather from "seeing patients from there and based on [P.A.'s] exposure[,] [he] kn[e]w it has problems. It has indoor air quality problems, water damage . . . ." (6/2/10 Hearing Tr. at 159; see also id. at 160-61).[45]  However, Dr. Santilli also testified that the "ultimate test[]" to know whether M.A. would experience a problem in a building is for him to step foot inside (6/17/10 Hearing Tr. at 156), which M.A. never did.  In this case, Dr. Santilli "rel[ied] on [P.A.'s] experiences from that school[]" to draw his conclusions.  (Id. at 157).  Dr. Santilli testified that he too "[n]ever set foot in the building[]" and [t]here was no sense in doing" any testing at that location when he "knew" there were molds present because of P.A.  (Id. at 110-11).

There has been water intrusion from recurring leaks at Chase Collegiate that have been addressed, and no mold testing has been done in the upper school of Chase Collegiate, no air quality tests have been done within the six years from 2004 through 2010, and there is no evidence that Chase Collegiate has a measurably different environment than Torrington High School. (FOF ¶ 56)(citations omitted).  As the Hearing Officer concluded, there is insufficient evidence to establish that the Torrington High School had more irritants, dust particles, or mold spores than Chase Collegiate, or that conditions at Torrington High School could exacerbate M.A.'s allergies. (FOF ¶ 55)(citation omitted).

C. PLACEMENT AT CHASE COLLEGIATE & ELIGIBILITY FOR TUITION REIMBURSEMENT

In light of the conclusion reached in Section III.B. supra, namely, that M.A. did not require special education services during his high school years, the Court need not address

---

[45]Dr. Santilli elaborated that P.A. had "irreversible asthma or remodeling[,]" and P.A. was the first patient in which he saw this irreversible lung disease.  (6/2/10 Hearing Tr. at 188-89).

the Parent's claim for tuition reimbursement.  (Dkt. #62, at 26-27, 28-44; Dkt. #64, at 7-8).[46]

Moreover, as set forth in Section III.A. supra, while defendant violated its procedural obligation to convene a PPT and develop an IEP for the school years 2006 through 2010, in this lawsuit, plaintiffs primarily seek reimbursement for the educational expenses associated with Chase Collegiate, as just indicated (see Dkt. #62, at 26-27, 28-44; Dkt. #64, at 7-8), specifically "just compensation for [defendant's] continuing violations from 2006-2007, 2007-2008, 2008-2009, and 2009-2010, including, but not limited to, tuition reimbursement, transportation, books and other expenses related to the cost of education at . . . Chase Collegiate. . . ." (Dkt. #62, at 44).   The Court has concluded in Section III.B. supra that there is insufficient evidence to prove that M.A. was entitled to special education services and that he was precluded from attending Torrington High School.  The Court leaves open, for additional motions and briefing, whether in the unusual circumstances of this case, plaintiffs are entitled any additional "relief as the court determines is appropriate[]" pursuant to 20 U.S.C. § 1415(i)(2), and/or attorney's fees pursuant to 20 U.S.C. § 1415(i)(3).  (See also Dkt. #62, at 44; see also J.A. v. Torrington Bd. of Educ., 08 CV 857 (MRK), Dkt. #37, at 2-4, 7-11 (plaintiffs preserve right to seek attorney's fees, costs, and any other equitable relief as appropriate in the future)).   Any supplemental motions and briefs shall be filed by plaintiffs **on or before October 29, 2013**.

## IV. CONCLUSION

For the reasons stated above, plaintiffs' Motion for Summary Judgment (Dkt. #55) is granted as to Counts One, Two and Three, but is denied as to Count Four, and conversely, defendant's Cross-Motion for Judgment on the Administrative Record (Dkt. #58) is denied as

---

[46]Additionally, in light of the foregoing conclusions, the Court need not address plaintiffs' stay-put claims. (Dkt. #62, at 27-28).

to Counts One, Two, and Three, but is granted as to Count Four.

Dated this 10th day of September, 2013, at New Haven, Connecticut.


/s/ Joan G. Margolis, USMJ
Joan Glazer Margolis
United States Magistrate Judge